Georgia Carolina Chemical Company v. Commissioner.
Georgia Carolina Chem. Co. v. Commissioner
Docket No. 110326.
United States Tax Court
1944 Tax Ct. Memo LEXIS 44; 3 T.C.M. (CCH) 1213; T.C.M. (RIA) 44371; November 18, 1944
*44 John W. Townsend, Esq., National Press Bldg., Washington, D.C. and M. H. Barnes, C.P.A., 15 Drayton St., Savannah, Ga., for the petitioner. F. L. Van Haaften, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency in income taxes for the fiscal year ended November 30, 1939, in the amount of $10,430.22. The only submitted issue is whether the respondent properly included the amount of the proceeds of certain insurance policies covering "Use and Occupancy - Business Interruption Insurance" in the petitioner's gross income for the fiscal year ended November 30, 1939. The case was submitted on a stipulation of facts and testimony. The facts as stipulated are so found. Other facts are found from the evidence. Findings of Fact Petitioner is a Georgia corporation with its principal office at 106 East Bay Street, Savannah, Georgia. Its return for the taxable period involved was filed with the collector of internal revenue at Atlanta, Georgia. Petitioner operated two plants in the manufacture of fertilizer. Plant No. 1, where complete manufacturing processes were conducted, was substantially destroyed by fire on June *45 2, 1939. Petitioner's books were kept and its income tax returns were filed on the accrual method. At the time of the fire the petitioner had in full force and effect 13 insurance policies issued by 11 separate insurance companies, providing "Use and Occupancy - Business Interruption Insurance (Co-insurance Form for Manufacturing Plant)". Each of such policies contained a rider, identical so far as material here, except as to face amount of coverage. The rider attached to the policy issued by The London Assurance of London, England, which is stipulated to be typical, provides: "1. The conditions of this contract are that if the (buildings) situate on the south side of Louisville Road, Savannah, Georgia, and known as Plant No. 1 and occupied as Fertilizer Plant or machinery, equipment (including patterns, dies, models and drawings) or raw stock contained therein (strike out "or raw stock" if rate used does not contemplate raw stock coverage), be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this Company shall be liable under this policy, subject to the following conditions and limitations, for *46 the actual loss sustained for not exceeding such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property described as covered by this policy as has been destroyed or damaged, commencing with the date of the fire and not limited by the date of expiration of this policy, to wit: Item I. $10,000.00 On (a) the net profit which is thereby prevented from being earned and (b) such charges and other expenses, including salaries of officers, executives, department managers, employees under contract and other important employees, as must necessarily continue during a total or partial suspension of business, to the extent only that such charges and expenses would have been earned had no fire occurred. This Item (I) covers expense of necessary heat, light or power, the cost of which is prevented from being earned during the time of total or partial suspension of business caused by fire. * * * * *
2. Expense to Reduce Loss. - This policy covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy (except expense incurred to extinguish the fire), not exceeding, however, *47 the amount by which the loss under this policy is thereby reduced, it being a condition that if there is insurance covering Use and Occupancy loss described under both Items (I and II,), the said expenses shall be apportioned to these Items in the proportion that the reduction in amount of loss under each Item bears to the reduction under both Items. 3. The amount of net profit, charges and expenses covered under Item I or Item II, shall be determined, whether for the purpose of ascertaining the amount of loss sustained or for the application of the Co-Insurance Clause, by giving due consideration to the experience of the business before the fire and the probable experience thereafter." Additional clauses contained in the respective insurance policies read as follows: "The liability under the respective Items of this policy shall not exceed the amount of insurance hereunder, nor a greater portion of any loss then the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by the respective Items of this policy. * * * the sum for which this company is liable pursuant to this policy shall *48 be payable sixty days after due notice, ascertainment, estimate, and satisfactory proof of the loss have been received by this company in accordance with the terms of this policy. * * * * *
This company shall not be held to have waived any provision or condition of this policy or any forfeiture thereof by any requirement, act or proceeding on its part relating to the appraisal or to any examination herein provided for; and the loss shall not become payable until sixty days after the notice, ascertainment, estimate, and satisfactory proof of the loss herein required have been received by this company, including an award by appraisers when appraisal has been required." Subsequent to the fire on June 2, 1939, the Fire Companies' Adjustment Bureau, Inc., a company owned by some 200 stock fire insurance companies, undertook the ascertainment of the petitioner's loss under the aforesaid policies of insurance for the insurers. For several months representatives of the petitioner and these representatives of the insurance companies carried on negotiations to determine the loss or damage under the use and occupancy provisions of such policies, and arrived at a loss figure of $76,510.47. *49 The representatives of the insurance companies prepared "Proofs of Loss" for that amount, which were executed by the president of the petitioner on November 17, 1939. Attached to the proofs of loss were schedules setting forth the computation used in arriving at the loss figure of $76,510.47. The proofs of loss contained a clause that "The furnishing of this blank or the preparation of Proofs by a representative of the above Insurance Company is not a waiver of any of its rights." Prior to the execution and filing of the proofs of loss the representatives of the petitioner and of the insurance companies had agreed, subject to approval of the insurance companies, to certain time elements, quantities of materials, amounts of expenses and other factors necessary to a computation of the loss sustained and covered by said Use and Occupancy - Business Itferruption Insurance. Based on such understandings the insurance companies' representatives prepared the Statement of Loss annexed to the proofs of loss and agreed to recommend to the insurance companies that the petitioner's claims be settled on the basis of such computation. Moreover, in arriving at the loss figure of $76,510.47, the *50 insurance company representatives advised the petitioner that they were not certain whether the co-insurance clause, under which the liability of the insurance company was limited to 80 per cent of the loss, would be applied against the entire loss or only against the loss caused by actual suspension. It was agreed that the matter should be submitted to the respective insurance companies, with the adjusters' recommendation that the co-insurance clause be waived as to the item of expense incurred for reducing the loss. Instructions had been issued to the insurance companies' adjusters that the waiving of the co-insurance clause against the provisions for reducing the loss was only to be made by the companies themselves. It was also understood between the respective negotiators that in the event the co-insurance clause was not waived by the companies the amount of the loss was to be renegotiated. On November 21, 1939, the representatives of the insurance companies submitted their report containing the same figures as those in the proof of loss, to the respective insurance companies. The settlement checks received by petitioner were in accordance with the adjusters' recommendations and *51 the proofs of loss. Prior thereto there had been neither admission nor denial of liability by any of the insurance companies. The total amount of the use and occupancy insurance in effect at the time of the fire was $120,000. The companies issuing the policies, the face amount of each policy, the loss pro rated to each, and the date on which the respective companies paid the loss, are set forth in the following schedule: Amount of
Pro rata share
Date of
Company
Insurance
of loss
Payment
Queen Insurance Co
$ 10,000
$ 6,375.87
11/28/39
World Fire & Marine Ins. Co.
5,000
3,187.94
11/28/39
Halifax Fire Ins. Co.h5,000
3,187.94
11/29/39
Halifax Fire Ins. Co.
10,000
6,375.87
11/29/39
Colonial Fire Underwriters
2,500
1,593.97
11/29/39
Fidelity & Guaranty Corp.
10,000
6,375.87
11/29/39
Continental Ins. Co.
10,000
6,375.87
11/30/39
Pacific Fire Ins. Co.
10,000
6,375.87
11/30/39
The London Assurance
2,500
1,593.97
12/2/39
The London Assurance
10,000
6,375.87
12/ 2/39
Firemen's Ins. Co.
10,000
6,375.87
12/ 4/39
Springfield Fire & Mar. Ins. Co.
15,000
9,563.81
12/ 7/39
North British & Mer. Ins. Co. Ltd.
20,000
12,751.75
12/ 8/39
$120,000
$76,510.47
*52 The amount of insurance received by the petitioner on account of the loss under the use and occupancy insurance coverage in the fiscal year ended November 30, 1939 was $39,849.20. The remainder amount of $36,661.27 was received in the fiscal year ended November 30, 1940. In closing its books for the fiscal year ended November 30, 1939, the petitioner credited "surplus" (profit and loss) with $22,414.58 and credited "deferred income" with the balance of $54,095.89 received as proceeds of the use and occupancy insurance. In its income tax return for the fiscal year ended November 30, 1939, the petitioner included in taxable income the amount of $22,414.58 of such insurance proceeds. In its income tax return for the fiscal year ended November 30, 1940, it returned as income the balance of such proceeds amounting to $54,095.89. The respondent, in his deficiency notice, included the total amount of the insurance proceeds, in the sum of $76,510.47, in taxable income for the fiscal year ended November 30, 1939. Opinion The question is whether the full amount of the proceeds of certain use and occupancy insurance policies was includible in the petitioner's taxable income for its fiscal *53 year ended November 30, 1939. The respondent has treated the total amount as includible. The petitioner contends that only $22,414.58 should be regarded as properly accruable in the taxable year. In the alternative, petitioner argues that in any event only the amount of $39,849.20, which it actually collected in the taxable year, should be included in income for that year. No issue is raised that the particular proceeds are not taxable as income. Nor is there any dispute as to the relative figures involved. The petitioner was on the accrual basis of accounting and so reported its income. The issue narrows to the question whether under the facts all the events necessary to fix the liabilities of the parties occurred within the taxable year. If the amount of the liabilities had become fixed or ascertainable the answer would be in the affirmative. ; . If not, a negative answer would follow. ; affd., ; cert. den., . *54 Cf. . The respondent contends that the fire which occurred on June 2, 1939 was an event sufficient to require the accrual of the total recovery. We do not agree. We think the fire gave rise to a contingent liability only. The respondent further argues there was an adjustment and accord between the parties which was completed within the taxable year. We do not believe the evidence warrants such a conclusion. It is true the proofs of loss filed by the petitioner were not executed until after an arrangement had been reached with the adjusters representing the insurance companies. Nevertheless, the evidence exclusively establishes the fact that the basis of the figures used in arriving at the amount set forth in the proofs of loss was conditioned upon the waiver by the insurance companies of the co-insurance clause as to certain items. It was definitely understood between the parties that the adjusters had no authority to waive any rights of the respective companies under the co-insurance clause. It was agreed that the matter of waiver was to be submitted to the insurance companies with a recommendation *55 by the the adjusters that the figure of loss set forth in the proofs of loss be accepted and the effect of the co-insurance provision waived. The evidence further conclusively establishes the fact that if the co-insurance clause was not waived the amount of the loss was to be renegotiated. It appears to us the contingency of this waiver was so substantial that it could not be held that all the events necessary to fix the amount of the liability were complete and definite at the time of the filing of the proofs of loss. Until the insurance companies made payment according to the proofs of loss, or until the 60 day period for making payment had expired, certainly there could have been no accord which would require or permit accrual. The plaintiff could not have brought suit based upon an accord, since the condition precedent as to waiver precluded the amount from being definitely fixed as a matter of law. The only recourse of the plaintiff was to await the insurance companies' action with respect to the waiver. If they refused to waive the application of the co-insurance provision the petitioner could either renegotiate the amount of its loss or submit its claim to arbitration as provided *56 in the policies. Until there was an accord that could be the basis of a claim at law, or an award was made by the board of arbiters, the petitioner's claim was conditional and contingent. Under such circumstances all the events necessary to fix the liabilities of the parties and to determine the amount of such liabilities had not occurred in the fiscal year ended November 30, 1939. The petitioner actually received in the fiscal year ended November 30, 1939 the sum of $39,849.20 as proceeds in full settlement of certain of its use and occupancy insurance policies. To that extent there was an accord and satisfaction of the petitioner's contingent claim. The petitioner's right to use the moneys became absolute at the time of their receipt. It was under no restrictions as to their use or enjoyment. . Cf. . The amount of $39,849.20 was taxable income to the petitioner in the taxable year ended November 30, 1939. . The respondent erred in including the total *57 amount of $76,510.47 in the petitioner's income for the taxable year ended November 30, 1939. Effect will be given to the other issue in accordance with the stipulation. Decision will be entered under Rule 50.